

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*     *(203)821-3700*
*157 Church Street, 25th Floor*     *Fax (203) 773-5376*
*New Haven, Connecticut 06510*     *www.justice.gov/usao/ct*

February 28, 2025

Andrew Giering, Esq.
Federal Defenders
265 Church Street
Suite 702
New Haven, CT 06510-7005

United States District Court
District of Connecticut
FILED AT   BRIDGEPORT
2/28/24  20
Dinah Milton Kinney, Clerk
By_____
Deputy Clerk

    Re:    United States v. Vincenzo Minutolo
           Case No.

Dear Attorney Giering:

    This letter confirms the plea agreement between your client, Vincenzo Minutolo (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") in this criminal matter.

## THE PLEA AND OFFENSE

    In consideration for the benefits offered under this agreement, the defendant Minutolo agrees to waive his right to be indicted and to plead guilty to a two-count Information charging wire fraud in violation of 18 U.S.C. § 1343.

    The defendant understands that to be guilty of this offense of wire fraud, the following essential elements must be satisfied:

1. There was a scheme or artifice to defraud, which had money or property as its object, or to obtain money or property by means of materially false and fraudulent pretenses, representations or promises, as alleged in the Information;

2. The defendant knowingly participated in the scheme or artifice with knowledge of its fraudulent nature and with the specific intent to defraud; and

3. In execution of the scheme, the defendant caused the use of interstate wires as specified in the Information.

Andrew Giering, *Esq.*
Page 2

**THE PENALTIES**

Imprisonment

Each count carries a maximum penalty of 20 years imprisonment.

Supervised Release

In addition, under each Count, the Court may impose a term of supervised release of not more than three years to begin after any term of imprisonment. 18 U.S.C. § 3583. The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to two years per revocation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

Fine

Under 18 U.S.C. § 3571, under each count, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense or twice the gross loss resulting from the offense, whichever is greater; or (2) $250,000. Here, the Government currently believes that the gross loss resulting from Count One is approximately $145,831 and twice that figure is $291,662. Similarly, the Government currently believes that the gross loss resulting from Count Two is as much as $272,361 and twice that figure is $544,722.

Special Assessment

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction, for a total of $200. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

Restitution

In addition to the other penalties provided by law, the Court also must order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

Regardless of restitution that may be ordered by the Court noted above, the defendant agrees to make restitution in the amount of $145,831 to the Victim Lenders and/or the U.S. Small Business Administration ("SBA"), depending on whether the SBA has assumed (as guarantor) the relevant Victim Lender's loan obligation as of sentencing. Further, the defendant agrees to make restitution to the Connecticut Department of Labor ("CT-DOL") in an amount found to be appropriate by the Court at sentencing relating to the conduct set forth in Count Two, which the parties agree is no less than $86,116 and which the Government submits may be as high as $272,361.

Interest, penalties, and fines

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (i) and § 3612(g). The defendant reserves the right to request that the Court waive interest and penalties as permitted by statute, and the Government reserves the right to oppose any such request.

## THE SENTENCING GUIDELINES

Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guidelines determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guidelines application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) disclosing to the United States Attorney's Office and the United States Probation Office a complete and truthful financial statement detailing the defendant's financial condition. The defendant expressly authorizes the United States Attorney's Office to obtain a credit report concerning the defendant.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government

Andrew Giering, *Esq.*
Page 4

at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into the attached stipulation, which is a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

Guidelines Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The parties agree that the defendant's base offense level is 7 under U.S.S.G. § 2B1.1(a)(1). The parties agree that the Guidelines losses total at least approximately $231,947. However, the Government submits that the Guidelines loss is as high as approximately $418,192, but otherwise falling in the range between $250,000 and $550,000, resulting in a 12-level upward adjustment under U.S.S.G. § 2B1.1(b)(1)(G). The defendant, however, reserves his right to argue instead for a total loss figure between $231,947 and $250,000, resulting in a 10-level upward adjustment under U.S.S.G. § 2B1.1(b)(1)(F). The parties intend to offer greater clarity on the scope of any disagreement of losses before sentencing.

The parties agree that two levels are added as there are more than 10 victims in the case under § 2B1.1(b)(2)(A), resulting in an adjusted offense level of 21.[1] The parties further agree that

---

[1] The "victims" include the five banks and the SBA regarding Count One, and then, on Count Two, the CT-DOL and 4 or more individual victims whose names/social security numbers and/or dates of birth were used to perpetuate the fraud set forth in Count Two. *See* U.S.S.G. Section 2B1.1, Application Notes 1, defining "Victim"; *see also id.* Application Notes 4, defining "victim" to include "any individual whose means of identification [name, social security number, date of birth] was used unlawfully or without authority."

Andrew Giering, *Esq.*
Page 5

three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 18 under the Government's calculation, with the defendant reserving his right to argue for a total offense level of 16 in light of the loss argument noted above.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category I. Similarly, the parties agree that, based on an initial assessment, the defendant qualifies for a two-level reduction for "certain zero-point offenders" under U.S.S.G. § 4C1.1, which would further reduce the defendant's total offense level to 16 under the Government's calculation or a total offense level of 14 under the defendant's potential calculation.

The parties reserve the right to recalculate the defendant's Criminal History Category, eligibility for a zero-point-offender reduction, and corresponding sentencing ranges if this initial assessment proves inaccurate. The Government reserves its right to argue that any such re-calculation is not a basis for any downward departure or variance and its right to oppose any request from the defendant for such a departure or variance.

Under the Government's calculation, a total offense level of 16, assuming the zero-point-offender and Criminal History I classifications, would result in a Guidelines range of 21 to 27 months of imprisonment (sentencing table) and a fine range of $10,000 to $95,000 (U.S.S.G. § 5E1.2(c)(3)). The defendant also is subject to a supervised release term of one to three years. U.S.S.G. § 5D1.2.

Under the defendant's potential calculation, a total offense level of 14, assuming the zero-point-offender and Criminal History I classifications, would result in a Guidelines range of 15 to 21 months of imprisonment (sentencing table) and a fine range of $7,500 to $75,000 (U.S.S.G. § 5E1.2(c)(3)). The defendant also is subject to a supervised release term of one to three years. U.S.S.G. § 5D1.2.

The Government and the defendant reserve their rights to seek a departure or a non-Guidelines sentence, and both sides reserve their right to object to a departure or a non-Guidelines sentence. Moreover, the defendant reserves the right to argue that a fine is not appropriate in this case, and the Government reserves the right to argue that a fine is appropriate in this case.

The defendant understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw the guilty plea if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

Andrew Giering, *Esq.*
Page 6

### Information to the Court

The parties reserve their rights to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## WAIVER OF RIGHTS

The defendant acknowledges and agrees that he is knowingly, intelligently, and voluntarily waiving the following rights:

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that he is waiving his right to be indicted.

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following the defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of

Andrew Giering, *Esq.*
*Page 7*

limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

### Waiver of Right to Challenge Conviction

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction. By pleading guilty, the defendant waives his right to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. In addition to any other claims the defendant might raise, the defendant waives the right to challenge the conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute(s) to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

### Waiver of Right to Appeal or Collaterally Attack Sentence

The defendant acknowledges that under certain circumstances, the defendant is entitled to challenge his sentence. In consideration for the benefits offered under this agreement, the defendant agrees not to appeal or collaterally attack the sentence in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241, if that sentence does not exceed 21 months of imprisonment, 3 years of supervised release, a $200 special assessment, a $95,000 fine, $145,831 in restitution to the Victim Lenders or SBA, and restitution to the CT-DOL in an amount found as appropriate by the Court at sentencing relating to the conduct set forth in Count Two as long as no greater than $272,361, even if the Court imposes such a sentence based on an analysis different from that specified above. Similarly, the defendant will not challenge any condition of supervised release imposed by the Court for which he had notice and an opportunity to object. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

### Waiver of Challenge to Plea Based on Immigration Consequences

The defendant understands that pleading guilty may have consequences with respect to his immigration status if the defendant is not a citizen of the United States. Under federal law, non-citizens are subject to removal for a broad range of crimes, including the offense(s) to which the defendant is pleading guilty. Likewise, if the defendant is a naturalized citizen of the United States, pleading guilty may result in denaturalization and removal. Removal, denaturalization, and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including the defendant's attorney or the district court, can predict to a

Andrew Giering, *Esq.*
Page 8

certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is automatic removal from the United States.

The defendant understands that he is bound by the guilty plea regardless of the immigration consequences of the plea. Accordingly, the defendant waives any and all challenges to the guilty plea and to the sentence based on those consequences, and agrees not to seek to withdraw the guilty plea, or to file a direct appeal or any kind of collateral attack challenging the guilty plea, conviction, or sentence, based on the immigration consequences of the guilty plea, conviction, or sentence. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in the appropriate forum.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because the defendant is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and the defendant (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which the defendant is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which the defendant has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and, in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands

Andrew Giering, *Esq.*
*Page 9*

that the Government reserves the right to notify any state or federal agency by which the defendant is licensed, or with which the defendant does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of the defendant's participation in the specific PPP loan fraud and unemployment insurance fraud, which forms the basis of the Information in this case. This provision does not apply to any conduct unknown to the Government at the time of the signing of this agreement.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, the defendant will not be permitted to withdraw the guilty plea.

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

MARC H. SILVERMAN
ACTING UNITED STATES ATTORNEY

CHRISTOPHER W. SCHMEISSER
ASSISTANT UNITED STATES ATTORNEY

Andrew Giering, *Esq.*
Page 10

 

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

_____      2/28/25
VINCENZO MINUTOLO                       Date
The Defendant

 

I have thoroughly read, reviewed, and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

_____      2/28/25
ANDREW GIERING, ESQ.                Date
Attorney for the Defendant

Andrew Giering, *Esq.*
*Page 11*

## STIPULATION OF OFFENSE CONDUCT AND RELEVANT CONDUCT

The defendant and the Government stipulate to the following offense conduct and relevant conduct that give rise to the defendant's agreement to plead guilty to the Information.

At all relevant times, the defendant MINUTOLO resided in Shelton, Connecticut. MINUTOLO claimed an ownership interest or representative relationship with City Sounds Productions LLC ("City Sounds").

### Background of the PPP loan Fraud

The U.S. Small Business Administration ("SBA") was an agency of the U.S. government that provided support to small businesses.

As discussed in greater detail below, MINUTOLO sought loans from various lending institutions authorized by the SBA to extend loans, including, among others, Fountainhead SBF LLC ("Fountainhead"); Harvest Small Business Finance LLC; Bentworth Capital Partners LLC; Capital Plus Financial, LLC; and Amur Equipment Finance, Inc. These authorized lenders are collectively referred to herein as "Victim Lenders."

### The CARES Act: Paycheck Protection Program Loans

In March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act provided emergency financial assistance to Americans suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses through the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in PPP funding. The PPP allowed qualifying small businesses and other organizations to receive unsecured loans at an interest rate of 1% with the loan proceeds required to be primarily used by businesses on payroll costs, leases or mortgage interest, and utilities.

In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business, to a designated lender. The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain a PPP loan, including, for Schedule C filers claiming to be sole proprietors, providing the gross income for the business for tax year 2019 or 2020 as reported on IRS Form 1040 (Schedule C). If the sole-proprietor borrower had a gross income greater than $100,000 in the given year, the program capped the loan amount at $8,333.33 in allowable costs times 2.5 for an applicable total loan amount of $20,833. The applicant further represented that the applicant had not and would not receive another PPP loan, excluding permissible second draw loans. The applicant would further provide documents supporting the application, including relevant tax records, such as the relevant 1040 for the sole proprietor and the relevant attached Schedule C, setting forth details regarding the ongoing business.

The PPP was overseen by the SBA, which had authority over all PPP loans. Individual PPP

Andrew Giering, *Esq.*
Page 12

loans, however, were issued by private approved lenders, such as the Victim Lenders, which received and processed PPP applications and supporting documentation, and then made loans using the lenders' own funds, which were guaranteed by the SBA if conditions were met.

Under the PPP loan program, after PPP loans were disbursed to approved borrowers and to incentivize the continued business operations, the CARES Act provided a process for borrowers' loans to be forgiven if the borrower used the funds for specific authorized purposes. Under those circumstances and consistent with the SBA regulations, the borrower could subsequently apply to the lender and SBA for loan forgiveness; make various representations regarding program compliance; and, if meeting the requisite conditions, the SBA would remove or "forgive" the borrower's requirement to repay the loan.

Applicants submitted the original PPP loan applications, and approved borrowers submitted forgiveness applications, through online use of a document processing service, typically through DocuSign, a company that facilitates the processing of paperwork executed online. As relevant to this Information, certain of the Victim Lenders, including Fountainhead, and the SBA would provide finalized PPP loan applications or forgiveness applications through the DocuSign service, indicating where the applicant or borrower needed to electronically sign and emailing the relevant loan applicant or borrower the link to access and electronically sign the documents. The applicant, in this case MINUTOLO, would sign the final loan documents, with the electronic signature and relevant documents electronically wired from MINUTOLO's home in Connecticut with a distinct Internet Protocol address to a DocuSign server outside of Connecticut, in Washington, Illinois, Texas, or Canada, and with the final processed documents then electronically wired from DocuSign servers to the respective Victim Lender.

<u>The Scheme and Artifice to Defraud Victim Lenders (PPP Fraud)</u>

From in or about March 2021 through in or about September 2021, in the District of Connecticut and elsewhere, the defendant MINUTOLO, knowingly and with intent to defraud, devised a scheme to defraud the Victim Lenders, including Fountainhead, and the SBA, and to obtain money and property of those entities by means of materially false and fraudulent pretenses, representations and promises. The PPP loan scheme, which resulted in losses of over $145,000, involved providing the Victim Lenders with false and fraudulent information when seeking loans through the PPP loan program and then providing additional fraudulent information to obtain forgiveness of certain of those loans.

Material misrepresentations in furtherance of the scheme on the initial or second draw loan applications included: (a) overstating the yearly gross income for the sole proprietorship; (b) misrepresenting that similar PPP loans had not been or would not be sought by MINUTOLO, as sole proprietor or doing business as City Sounds or any other entity, when he in fact had sought and obtained, and intended to seek and obtain, such loans; and (c) providing purportedly genuine IRS tax filings supporting the business gross income figures that had, in fact, never been filed with the IRS and falsely represented the true gross income of the business. Similarly, on the forgiveness applications submitted, MINUTOLO materially misrepresented having complied with all the requirements of the PPP rules, when he had not complied with those rules by fraudulently obtaining monies in the first place.

Andrew Giering, *Esq.*
Page 13

By way of example, on or about March 13, 2021, MINUTOLO submitted and caused the submission of loan application #------8605 to Fountainhead for a $20,833 PPP loan to MINUTOLO doing business as City Sounds. The submission included material misrepresentations on the application itself and in the documents submitted in support, including:

a.  That the total amount of gross income for City Sounds was $468,950 for 2019 (purportedly taken from MINUTOLO's 2019 IRS Form 1040, Schedule C, Line 7), when City Sounds had not earned that annual gross income;

b.  Providing along with the application, the purported 2019 Form 1040, including the attached Schedule C, listing gross income of $468,950 for City Sounds Productions LLC when, in fact, the Schedule C was false and had not been filed with the IRS; and

c.  Providing along with the application, purported estimated tax payment vouchers for the four quarters of 2020 for $31,883 per quarter, when such vouchers and the represented payments had not been submitted or made to the IRS.

In execution of the above-described scheme, from inside the District of Connecticut to outside the District of Connecticut, on or about March 13, 2021, MINUTOLO caused a transmission of certain writings, signs, signals, pictures, and sounds by means of wire communications in interstate commerce, that is, the transmission of the original PPP application noted above, including relevant forms, using the DocuSign platform, from MINUTOLO'S home address in Connecticut to the DocuSign servers outside of Connecticut.

<u>Background of the Unemployment Insurance Fraud</u>

The Connecticut Department of Labor ("CT-DOL") was the state agency in Connecticut that administered unemployment insurance benefits for residents of Connecticut.

<u>The CARES Act: Unemployment Insurance</u>

In March 2020, the CARES Act created a new temporary federal unemployment insurance program for pandemic unemployment assistance, unemployment compensation and lost wages ("Pandemic Unemployment Assistance"). Pandemic Unemployment Assistance provided unemployment insurance ("UI") benefits for previously working individuals who were not eligible for other types of UI due to their employment status (e.g., they are self-employed, independent contractors, or gig economy workers). Pandemic Unemployment Assistance provided unemployment payments beginning on or after January 27, 2020, and continuing, after two extensions of the program, to an ending date of September 4, 2021. The CARES Act also created a new temporary federal program called Federal Pandemic Unemployment Compensation ("FPUC") that provided an additional $600 in weekly benefits to those eligible for Pandemic Unemployment Assistance and/or regular UI. Claimants were eligible to receive FPUC inaddition to the Pandemic Unemployment Assistance or UI benefits from March 29, 2020 to July 25, 2020.

Andrew Giering, *Esq.*
Page 14

      From the week ending August 1, 2020, to September 5, 2020, Pandemic Unemployment Assistance and UI claimants were also eligible to receive Federal Lost Wages Assistance ("LWA") in the amount of $300 per week, funded by the Federal Emergency Management Agency ("FEMA") through the Disaster Relief Fund. Eligible claimants could receive as much as $1,800 in LWA. Claimants did not need to apply separately for the LWA program to receive supplemental benefits. Claimants were eligible to receive LWA if they received at least $100 per week from an existing pandemic UI program and self-certified they were unemployed or partially unemployed because of disruptions caused by the pandemic. On or about December 27, 2020, the Continued Assistance for Unemployed Workers of 2020 Act was signed into law, which provided an additional $300 in FPUC per weekfor UI and Pandemic Unemployment Assistance claims.

      A person seeking standard unemployment benefits from the CT-DOL would apply for benefits by filing a claim or reopening a previously filed claim. A person would file or reopen a claim online through the CT-DOL's website or by telephone. Once a claim was established or reopened a person was required to file a weekly claim, either online or by telephone, to receive benefits each week.

      To qualify for Pandemic Unemployment Assistance, a claimant was first required to file for UI benefits and then be denied due to the absence of W-2 wages previously earned, after which the claimant was able to apply for Pandemic Unemployment Assistance. As part of the Pandemic Unemployment Assistance application process, a claimant was required to provide a first and last name, SSN, DOB, and a residential and/or mailing address. In addition, the claimant was required to select their preferred payment method: direct deposit to a bank account of the applicant's choice or a pre-paid debit card issued by KeyBank. The base weekly benefit rate for Pandemic Unemployment Assistance, for which no proof of income was required, was $198. Starting in May 2021, individuals had to provide proof of prior income or face subsequent claim denial.

      A claimant filing for Pandemic Unemployment Assistance with no proof of income could receive a weekly base rate of $198, plus an additional $600 per week in FPUC payments for 17 weeks, plus an additional $300 per week in LWA payments for six weeks. For example, a claimant filing in September 2020, with a request to backdate the claim back to March 2020, would have received a lump-sum payment averaging more than $16,000.

      Pandemic Unemployment Assistance claims submitted to the CT-DOL were processed through Bluewolf "NA21 servers" located in Chicago, Illinois, or in the District of Columbia, as well as Amazon Web Services, located on a server in Ohio. Claimants could only submit applications via the internet. Individuals in Connecticut who transmitted Pandemic Unemployment Assistance related information to the CT-DOL via the internet thereby caused wires to be transmitted to and/or from their originating IP address in Connecticut to servers outside of Connecticut.

Andrew Giering, *Esq.*
*Page 15*

For the direct deposit of unemployment benefits to a recipient's bank account or debit card, the CT-DOL electronically transmitted a payment file to JP Morgan Chase, which is a financial institution, for processing. The payment file contained information about how much money should be directly deposited to a recipient's bank account or to a KeyBank debit card associated with a specific recipient and bank account number. JP Morgan Chase subsequently transmitted information through the electronic payments network utilized by financial institutions in the United States so that the designated payment funds would be directly deposited to the recipient's bank account or to a KeyBank debit card sent to the recipient. In addition to the application-based wirings noted above, the CT-DOL electronically transmitted the payment file in interstate commerce from its servers in Connecticut to JP Morgan Chase's servers, which are outside of Connecticut.

### The Scheme and Artifice to Defraud (UI Fraud)

From in or about March 2020 through in or about April 2021, in the District of Connecticut and elsewhere, the defendant MINUTOLO, knowingly and with intent to defraud, devised a scheme to defraud the CT-DOL, and to obtain money and property of the CT-DOL, by means of materially false and fraudulent pretenses, representations and promises. The scheme, which resulted in losses of more than $86,000 and as much as approximately $273,000, involved MINUTOLO providing the CT-DOL with false and fraudulent Pandemic Unemployment Assistance applications seeking unemployment insurance payments in others' names, with the applications submitted online by MINUTOLO from his home in Connecticut.

On the submissions, MINUTOLO typically (a) materially misrepresented the existence of viable applicants by using as applicants individuals who had died or otherwise did not know that their name and sometimes other personal information was being used; and/or (b) misstated the applicants' prior and ongoing employment history, where accurate information would have made the applicants ineligible for unemployment insurance.

By way of example, on July 22, 2020, MINUTOLO submitted an online Pandemic Unemployment Assistance application to the CT-DOL for W.H., MINUTOLO's grandfather who had been deceased since 2014. On that application, MINUTOLO made various material misrepresentations, including that W.H. was eligible for unemployment insurance because W.H. was last self-employed at Joe's Steaks and was currently available for full time work. The application also included a current telephone number for W.H., a number actually associated with MINUTOLO. Additionally, the application manufactured a false social security number for W.H. And, in furtherance of the scheme, MINUTOLO continued to make online weekly certifications to CT-DOL attesting that the information contained in W.H.'s application remained true in order to receive continued unemployment insurance benefits.

### Wiring in Furtherance of the Scheme and Artifice

On or about July 22, 2020, in execution of the above-described scheme and relating to the example of the original application submitted by MINUTOLO for W.H., from inside the District of Connecticut to outside the District of Connecticut, MINUTOLO caused the transmission of certain writings, signs, signals, pictures and sounds by means of wire communications in interstate

Andrew Giering, *Esq.*
Page 16

commerce, that is, on or about July 22, 2020 (and on additional periodic dates thereafter), MINUTOLO caused the transmission of Pandemic Unemployment Assistance application information to the CT-DOL.

    This written stipulation is part of the plea agreement. The defendant and the Government reserve their right to present additional offense conduct and relevant conduct to the Court in connection with sentencing.

_____
VINCENZO MINUTOLO
The Defendant

_____
CHRISTOPHER W. SCHMEISSER
ASSISTANT UNITED STATES ATTORNEY

_____
ANDREW GIERING, ESQ.
Attorney for the Defendant

Andrew Giering, *Esq.*
Page 17

## **RIDER CONCERNING RESTITUTION**

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A as follows:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense:

    A. Return the property to the owner of the property or someone designated by the owner; or

    B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

    The greater of -
    (I) the value of the property on the date of the damage, loss, or destruction; or

    (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim –

    A. Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

    B. Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

    C. Reimburse the victim for income lost by such victim as a result of such offense.

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services.

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the Court-ordered restitution, the Court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, 18 U.S.C. § 3565, or a modification of the conditions of supervised release, 18 U.S.C. § 3583(e). Failure to pay restitution also may result in the defendant being held in contempt, or the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. *See* 18 U.S.C. §§ 3613A, 3614. Moreover, in the event of default, notwithstanding any installment schedule for the payment of restitution, the Court may order payment of the entire amount of restitution due within 30 days after notification of the default,

Andrew Giering, *Esq.*
*Page 18*

subject to the provisions of 18 U.S.C. §§ 3572(i) and 3613A. The Court also may order that the defendant give notice to any victim(s) of the offense under 18 U.S.C. § 3555.